# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2354-17T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.B.,

     Defendant-Appellant,

and

M.D.N.,

     Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF M.L.B., a minor.

_____

Argued October 31, 2018 – Decided  November 26, 2018

Before Judges Fuentes, Accurso and Moynihan.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0177-17.

Christine Olexa Saginor, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Christine Olexa Saginor, on the brief).

Katherine A. Gregory, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Katherine A. Gregory, on the brief).

James J. Gross, Designated Counsel, argued the cause for minor M.L.B. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; James J. Gross, on the brief).

PER CURIAM

Defendant J.B. is the biological father of M.L.B., a five-year-old girl born in 2013. Defendant appeals from the Judgment of Guardianship issued by the Family Part terminating his parental rights to his daughter.[1] Judge Nora J. Grimbergen conducted a two-day guardianship trial and found, by clear and convincing evidence, that the Division of Child Protection and Permanency (Division) satisfied all four prongs of the best interests of the child test codified in N.J.S.A. 30:4C-15.1(a). In this appeal, defendant argues Judge Grimbergen erred in finding the Division presented sufficient competent evidence to satisfy,

---

[1] The Family Part also terminated the parental rights of M.L.B.'s biological mother, M.D.N. She did not appeal the Judgment of Guardianship.

A-2354-17T3

by clear and convincing evidence, the first, second, and fourth prongs of the best interests of the child test.

After reviewing the record developed at trial, we reject defendant's argument and affirm substantially for the reasons expressed by Judge Grimbergen in her January 8, 2018 memorandum of opinion. In lieu of restating the history of the Division's involvement in this child's life, we incorporate by reference Judge Grimbergen's description of the evidence presented at the Guardianship trial. We will, however, summarize the salient facts underpinning Judge Grimbergen's decision.

At age sixteen, defendant was tried as an adult and convicted of first degree aggravated manslaughter, N.J.S.A. 2C:11-4(a). He served a twenty-year term of imprisonment at a State penal institution before M.L.B.'s birth. Three days before the child's birth, the Division received a referral from the medical staff assigned to monitor M.D.N.'s prenatal condition that neither defendant nor M.D.N. had stable housing. The Division also learned M.D.N. used marijuana throughout her pregnancy, and that defendant had a chronic substance abuse problem involving both alcohol and marijuana. The record also shows defendant was diagnosed with schizophrenia and other socially disabling mental health issues. Based on the aggressive and controlling way he interacted with M.D.N.,

the medical staff were also concerned about defendant's propensity for domestic violence.

At the time the hospital staff made this referral to the Division, defendant and his pregnant paramour were staying in his niece's home. Defendant refused to allow the Division caseworker assigned to investigate the hospital's referral to enter the residence. He eventually spoke with the caseworker and admitted he was unemployed and had been smoking marijuana on a regular basis for approximately thirty years. He admitted he continued to use marijuana even while serving his twenty-year prison sentence. Defendant was released from prison approximately five years ago.

With respect to his mental health, defendant told the caseworker he received psychotherapy at the Community Psychiatric Institute (Institute) in 2011. According to defendant, the psychiatric staff at the Institute diagnosed him with intermittent explosive disorder, schizophrenia, and anti-social personality disorder. Despite this diagnosis, defendant refused to take the psychiatric medication prescribed by the physicians at the Institute. He was also referred to substance abuse and mental health treatment facilities on multiple occasions, but steadfastly refused to attend. In the record of the interview, the

caseworker noted defendant had a strong odor of alcohol emanating from his breath.

M.D.N. tested positive for marijuana and heroin the day after she gave birth to M.L.B. The infant was premature, underweight, suffered from withdrawal symptoms related to her mother's marijuana and heroin use while pregnant, and was born with a sexually transmitted disease that required immediate treatment with antibiotics. She was placed in the neonatal intensive care unit. The Division thereafter filed an order to show cause and a verified complaint in the Family Part seeking temporary legal custody of M.L.B. The Division also discovered defendant was no longer residing with his niece and was homeless at the time and arranged for defendant to receive mental health services at the hospital; defendant declined to participate. The court granted the Division's application for temporary custody of M.L.B. The court found the removal of the child was necessary to protect her health, safety, and welfare. The court particularly noted defendant's criminal history, untreated mental health and substance abuse problems, and failure to avail himself of the treatment programs offered by the Division as reasons for finding him unfit to care for his infant daughter.

A-2354-17T3

The hospital discharged M.L.B. at the end of July 2013. The Division initially placed M.L.B. with a resource parent who was unable to care for the infant due to her work schedule. Shortly thereafter, the Division placed two-month-old M.L.B. in a new foster home in which the resource parents expressed an immediate interest to adopt her. M.L.B. remains in this resource home to this day and her resource parents are still committed to adoption.

At the Division's behest, psychologist Minerva C. Gabriel, Ph.D., evaluated defendant in August 2013.[2] According to defendant, he did not have the support of his family. His parents were deceased and he did not have a close relationship with his siblings. Defendant also told Dr. Gabriel that he was homeless, unemployed, lacked health insurance, used marijuana on a regular basis, and drank alcohol to the point of inebriation as a means of falling asleep. He was a diagnosed schizophrenic who experienced hallucinations and had bouts of rage. Defendant was concerned that his psychiatric problems would cause him to harm someone. Dr. Gabriel noted the Division had referred defendant to programs offering psychological counseling and substance abuse

_____

[2] Dr. Gabriel did not testify at trial. The court admitted into evidence her report of defendant's psychological evaluation without objection.

A-2354-17T3

treatment. These referrals proved to be ineffective because defendant either did not attend or was discharged from these programs due to his poor attendance.[3]

Defendant's involvement with the criminal justice system did not end after he completed his twenty-year sentence for aggravated manslaughter. On June 11, 2014, defendant was convicted of simple assault for threatening to kill M.D.N. The court ordered defendant pay fines and mandatory penalties; he was incarcerated related to this offense from May 2014 to June 11, 2014. Because the victim of this assault was the biological mother of defendant's daughter, this offense also constituted an act of domestic violence. See N.J.S.A. 2C:25-19(a)(2).

On July 7, 2014, Integrity House accepted defendant into its outpatient substance abuse treatment program. In addition to addiction therapy, this program provided defendant with individual counseling, group counseling, anger management classes, and relapse prevention courses. Defendant also informed the Division he had found employment. Based in large part on these

---

[3] The programs and organizations made available to defendant included Catholic Charities, to arrange for admission into a residential substance abuse treatment program; Family Connections, to provide parenting skills classes; Babyland, which declined to accept defendant based on the risk that he would harm himself or others; and Family Connections, which provided defendant individual psychotherapy sessions, couples counseling, and anger management courses.

A-2354-17T3

positive developments, on July 14, 2014, the Family Part rejected the Division's plan of termination of parental rights followed by adoption. The judge was hopeful defendant would follow through with these services and take advantage of this employment opportunity to provide a realistic plan for the care of his young daughter. As ordered by the court, the Division prepared a case plan for reunification.

The Family Part held a permanency hearing three days later. The Division reported to the court that defendant had not participated in services because he was recently arrested and charged with threatening to kill M.D.N., another act of domestic violence. See N.J.S.A. 2C:25-19(a)(3). As a result of a substance abuse evaluation performed on July 24, 2014 related to his marijuana abuse and agreed to attend an intensive outpatient treatment program at Integrity House. Division records also show defendant participated in domestic violence classes related to this alleged threat to kill the child's biological mother. On July 25, 2014, Catholic Charities evaluated defendant regarding his mental health issues. Defendant reported he suffered from seizures, but did not take the medication prescribed by physicians. He was employed on a part-time basis and his housing situation remained unstable.

8

On August 19, 2014, the court again rejected the Division's recommendation to terminate defendant's parental rights followed by the child's adoption by her foster parents. The court gave defendant additional time to address the problems preventing his reunification with his daughter. The judge was particularly concerned about defendant's ability to secure gainful employment and stable, suitable housing. If defendant was able to successfully address these issues, the judge remained hopeful defendant would be able to provide a realistic reunification plan that would be in the child's best interests.

On August 27, 2014, Dr. Alexander Iofin conducted a psychiatric evaluation of defendant.[4] According to Dr. Iofin, defendant denied having any mental health or behavioral problems. With respect to his substance abuse issues, defendant claimed he used marijuana and alcohol approximately one month before the evaluation. Dr. Iofin opined defendant suffers from an anxiety disorder, a depressive disorder, and either an intermittent explosive disorder or an impulse control disorder. He recommended defendant participate in a drug treatment program, submit to drug screenings on a regular basis, obtain and maintain stable housing and employment, and participate in a

_____

[4] Dr. Iofin also did not testify at the guardianship trial. The court nevertheless admitted into evidence his report of defendant's psychiatric evaluation without objection.

A-2354-17T3

neuropsychological evaluation. On September 9, 2014, Integrity House reported that although his attendance had improved, defendant tested positive for alcohol. Nine days later, the Family Part approved the Division's plan of termination of parental rights followed by adoption. The court found that despite recent indications of improvement, defendant required extensive treatment to address his mental health issues. In early December 2014, defendant informed the Division he was still homeless.

On January 10, 2015, Charles S. Hasson, Ph.D., conducted a neuropsychological evaluation of defendant.[5] Dr. Hasson did not find any evidence suggesting defendant has any intellectual deficits or memory impairments. However, defendant denied ever having seizures or suffering from mental health problems, including schizophrenia. Dr. Hasson opined defendant suffers from a character disorder that prevents him from managing common life challenges. His evaluation indicated defendant experienced behavioral problems while incarcerated. Dr. Hasson also found defendant had serious difficulties securing stable housing, and obtaining and maintaining employment. In the course of the evaluation, defendant was hypersensitive to criticism and

---

[5] Dr. Hasson did not testify at the guardianship trial. The court admitted his report into evidence without objection.

A-2354-17T3

had a "serious anger control problem." Dr. Hasson concluded that defendant is "his own worst enemy" because he is unwilling or unable to accept the help he needs.

Dr. Hasson opined defendant is not able to psychologically parent a child at this time or in the foreseeable future. Although defendant is able to "mouth the platitudes," Dr. Hasson concluded he does not have the "frustration tolerance and coping skills" necessary to provide a stable home. Defendant's parenting plans are "unrealistic in terms of providing for his daughter." According to Dr. Hasson, the child would be at risk of neglect and harm if she were to be placed in defendant's care. This cycle of initial compliance with Division-sponsored services followed by instability and expulsion from these programs was a discernable pattern in this case. Dr. Hasson found equally problematic defendant's failure to acknowledge his mental health problems.

On April 23, 2015, psychologist Mark Singer conducted a psychological evaluation of defendant.[6] Defendant reported missing visitation time with his daughter due to illness and a lost bus pass. Defendant told Singer he had been working as a mail sorter for approximately "a month and a half." He did not

---

[6] Unlike the other mental health professionals who previously examined defendant, Singer testified at the guardianship trial. The court admitted his reports in evidence without objection.

A-2354-17T3

identify the name of his alleged employer. Defendant also told Singer his brother "would care" for M.L.B. while he was at work. With respect to housing, defendant claimed that for the past week he had been residing alone in a two-bedroom apartment. Defendant told Singer this alleged apartment was a suitable residence for the child. Singer noted that when he asked defendant "what he would do if his daughter had a high fever," defendant responded: "call 911." When Singer asked defendant what was the normal body temperature of a child, defendant responded: "86.7."

In his psychological evaluation report, Singer concluded defendant: (1) lacked stable housing; (2) missed a number of visitation opportunities with the child without good cause; and (3) was in denial with respect to his substance abuse and mental health problems. He opined that defendant could not handle the stress of parenting and lacked the insights and skills necessary to cope with events that may arise related to the child's safety and overall welfare. Because of these deficiencies, Singer determined defendant was not able to parent M.L.B. at that time. He did not rule out the possibility that defendant could be a parenting option in the future if he complied with substance abuse and mental health services.

A-2354-17T3

Singer also relied on his interactions with defendant that same day to conduct a bonding evaluation between defendant and his daughter. He noted defendant minimally interacted with M.L.B., despite the child being slightly verbal. Singer wrote in his report: "[a]t times, [defendant] focused more of his attention towards his cell phone than he did towards [M.L.B.]." Singer noted that when the visiting session was over, "[t]he child had no difficulty separating from [defendant]."

Singer also conducted a bonding evaluation between M.L.B. and her resource mothers who wanted to adopt her. The resource parents had been in an exclusive romantic relationship for twenty years and were joined in a civil union. They have a ten-year-old biological child, are both employed, and reside in a three-bedroom apartment located in a two-family house. Both resource parents were loving and attentive to M.L.B. during the bonding evaluation. M.L.B. appeared very well cared for physically, and was happy and joyful. Singer opined M.L.B. viewed her resource parents as her central parental figures, and did not view defendant as her parent. The child lacked a secure emotional attachment to defendant and, conversely, showed a strong and secure attachment to her resource mothers. Singer opined that the loss of M.L.B.'s relationship

13

with her resource mothers would cause significant psychological and emotional harm to the child that defendant would be unable to mitigate.

Singer also opined that if defendant improved his parenting skills and participated in psychological therapy, he may be able to mitigate some of the psychological harm M.L.B. would experience if her relationship with her resource family was severed. However, due to M.L.B.'s age and the length of time she has spent with her foster family, Singer noted the window of time to support defendant becoming a viable parenting option was "EXTREMELY LIMITED."

Despite this evidence, the court rejected the Division's plan for termination of defendant's parental rights and gave defendant several additional opportunities to address the problems we have described at length here. Ultimately, these efforts proved to be futile. Defendant remained addicted to illicit narcotics, lacked stable housing, and failed to participate in substance abuse treatment. On January 10, 2017, the court approved the Division's plan of termination of parental rights followed by adoption.[7] A second bonding

---

[7] On January 31, defendant tested positive for marijuana and alcohol. He tested positive for marijuana seven more times from February 3 to 27, 2017.

evaluation conducted in February 2017 by psychologist Elizabeth Stillwell reached the same conclusions Singer reached nearly two years earlier.

Judge Grimbergen conducted the guardianship trial on two consecutive days in December 2017. The Division presented the evidence we have described herein. Defendant testified in his own defense. Judge Grimbergen found, by clear and convincing evidence, the Division proved all four statutory prongs codified in N.J.S.A. 30:4C-15.1(a). She laid out her factual findings and conclusions of law in a memorandum of opinion dated January 8, 2018.

It is well-settled that parents have a fundamental constitutional right to raise their children. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014). However, this parental right is tempered by the State's commensurate "responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012). The termination of parental rights is viewed as a "weapon of last resort." Ibid. As this court has aptly noted, "[a]fter the elimination of the death penalty, we can think of no legal consequence of greater magnitude than the termination of parental rights." In re Adoption of Child by J.E.V., 442 N.J. Super. 472, 481 (App. Div. 2015). Thus, a court may

terminate parental rights "only in those circumstances in which proof of parental unfitness is clear," and with great "caution and care." F.M., 211 N.J. at 447.

"The best-interests-of-the-child standard codified at N.J.S.A. 30:4C-15.1(a) 'aims to achieve the appropriate balance between parental rights and the State's parens patriae responsibility.'" R.G., 217 N.J. at 554 (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 280 (2007)). In order to terminate defendant's parental rights, the Division must prove, by clear and convincing evidence the following statutory criteria:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

16

> [N.J.S.A. 30:4C-15.1(a); see also N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11 (1986) (reciting the four controlling factors codified in N.J.S.A. 30:4C-15.1(a)).]

These four statutory factors "are not discrete and separate" but instead, "they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). The Division must prove each of the four factors by clear and convincing evidence. R.G., 217 N.J. at 554. That standard "is not a hollow one," N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 168 (2010), as such evidence produces "a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the precise facts in issue." Ibid. (quoting In re Seaman, 133 N.J. 67, 74 (1993) (internal quotation and editing marks omitted)).

The scope of review on appeals from orders terminating parental rights is limited. R.G., 217 N.J. at 552. We are bound to uphold the trial court's findings as long as they are supported by "adequate, substantial, and credible evidence." Ibid. The Family Part's decision should be reversed or altered on appeal only if the trial court's findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004)

(quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). Likewise, the appellate court must give considerable deference to the family court judge's expertise and opportunity to have observed the witnesses firsthand and evaluate their credibility. R.G., 217 N.J. at 552-53. The Family Part "has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting M.M., 189 N.J. at 293).

Additionally, as the fact finder, while the "trial judge is 'not required to accept all or any part of [an] expert opinion,'" In re Civil Commitment of R.F., 217 N.J. 152, 156, 174 (2014) (quoting In re D.C., 146 N.J. 31, 61 (1996)), he or she may "place[] decisive weight on [the] expert." Id. at 156. Even where an appellant alleges "error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," deference must be afforded unless the judge "went so wide of the mark that a mistake must have been made." M.M., 189 N.J. at 279 (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not

entitled to any special deference." R.G., 217 N.J. at 552 (quoting Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995)).

Despite the repeated opportunities the Family Part provided defendant to address his chronic and severe psychiatric and substance abuse problems, he remains unable or unwilling to maintain a stable lifestyle. Defendant's dysfunctional lifestyle is clearly not in this child's best interests. The mental health experts who evaluated defendant unanimously agreed that he is unable to safely care for this child. The Division considered, investigated, and ruled out all of the individuals defendant offered as alternative caregivers. This five-year-old child has formed a strong emotional and psychological bond with her two mothers, the only parents she has ever known. It is highly probable that severing this bond would cause her serious emotional and psychological harm. The mental health experts all agreed that defendant is not capable of mitigating this harm. They also agreed that it is in the child's best interests to terminate defendant's parental rights to allow her foster parents to complete the process of adoption. The need for permanency and stability in this child's life is of paramount importance. We discern no legal or factual basis to disturb Judge Grimbergen's decision to terminate defendant's parental rights.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2354-17T3