# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5424-17T4
                A-5425-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

C.J.R.,

      Defendant-Appellant/
      Cross-Respondent,

and

C.R.A.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.A.R.
and C.L.A., Minors,

      Respondents/Cross-Appellants,

and

C.A.,

Minor.

_____

Argued September 18, 2019 – Decided October 22, 2019

Before Judges Whipple, Gooden Brown and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0117-16.

Adrienne Marie Kalosieh, Assistant Deputy Public Defender, argued the cause for appellant/cross-respondent (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Adrienne Marie Kalosieh, on the briefs).

Eric R. Foley, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Eric R. Foley, on the briefs).

Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for respondents/cross-appellants (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Melissa R. Vance, on the brief).

Christian Arthur Arnold, Assistant Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason Wade Rockwell, Assistant Attorney General, of counsel; Christian Arthur Arnold, on the brief).

A-5424-17T4

Todd S. Wilson, Designated Counsel, argued the cause for minor C.A. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Todd S. Wilson, on the brief).

PER CURIAM

In these consolidated appeals, following a remand to the Family Part, defendants C.J.R. (Cindy) and C.R.A, (Charles) both appeal from the judgment terminating their parental rights to their children A.A.R. (Anne), C.L.A. (Claire), and C.A. (Chip).[1] Anne and Claire cross-appeal the entry of guardianship as to them. The issue on appeal is whether the Division of Child Protection and Permanency (Division) proved by clear and convincing evidence that parental rights should be terminated pursuant to N.J.S.A. 30:4C-15.1(a). We reverse.

The facts in the record of the original trial are also recounted fully in our previous decision, N.J. Div. of Child Protection & Permanency v. C.J.R., 452 N.J. Super. 454, 458, 463-64 (App. Div. 2017), therefore, we repeat only those necessary to address the issues raised here.

The Division's involvement with the family began in February 2014, after defendants brought six-week-old Chip to the emergency room for medical

---

[1] For simplicity, we refer to the parties by the same pseudonyms as used in the prior Appellate Division decision.

treatment. Chip had suffered four rib fractures as well as head trauma, including brain contusions and subdural hematomas, injuries a consulting physician concluded were consistent with physical abuse, but ones for which defendants, the child's only caregivers, offered no explanation. Id. at 458-59. All three children were removed from defendants' care but were returned to their custody that October. Ibid.

In November 2014, Chip was rushed to the hospital after having a seizure. Id. at 459. Tests revealed subdural hematomas, not attributable to his prior condition, and "extensive multi-layered retinal hemorrhages." Id. at 459-60. Although Cindy reported that Chip fell from a sitting position on the floor and hit his head a few weeks earlier, an emergency room physician opined the injuries were likely sustained just a few days prior and, absent any explanation, were indicative of physical abuse. Ibid. All three children were again removed from defendants' care. Id. at 460.

After a hearing, the Family Part judge found, by the heightened standard of clear and convincing evidence and relying on a burden-shifting paradigm permissible under Title Nine, that both defendants abused and neglected Chip. Id. at 461-62. In light of that heightened standard, the judge gave the abuse and neglect finding preclusive effect at the subsequent termination proceeding,

concluding that the Division thereby met its burden as to the first prong of the applicable best interest standard. Id. at 464, 467. Ultimately, the judge found the Division also satisfied its burden as to the balance of the standard and therefore, the defendant's parental rights should be terminated as to all three children. Id. at 467.

We reversed, concluding that a finding made using the burden-shifting paradigm authorized only under Title Nine could not be given preclusive effect in a Title Thirty guardianship proceeding, and remanded the matter for a new trial to be completed within sixty days. Id. at 470-75. We also noted the court made findings as to Chip on all except the first prong of the standard, but "made no specific findings under prongs one or two regarding Claire and Anne." Id. at 474. We explained:

> While N.J.S.A. 9:6–8.46(a)(1) provides that "proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of . . . the parent," this does not mean that harm to one child is conclusive proof of harm to another child. The Title Nine findings made by the judge were confined to consideration of whether Chip was abused; there were no explicit findings that either Anne or Claire were abused or neglected. Moreover, the Division caseworker conceded neither was harmed, meaning that any harm attributed to have been visited upon either girl was derived from the harm to Chip. Therefore, the determination of the judge terminating Charles and Cindy's parental rights to Claire and Anne

A-5424-17T4

was not supported by sufficient credible evidence, and was in error. We therefore vacate the judgment of guardianship entirely as to Claire and Anne.

[Id. at 474-75.]

However, we continued that, "we believe that going forward from here, the trial court should be allowed to consider each prong in the light of any developments since trial, and shall have the discretion to permit any updated evaluations or discovery that may be warranted." Id. at 475. We then directed that a new trial be conducted on remand within sixty days with no indication that the trial must be limited to Chip. Ibid.

On remand, the Family Part judge, at a permanency hearing on March 23, 2018, found by a preponderance of the evidence that it was not safe to return the children to defendants due to the significant injuries Chip suffered in 2014. The Family Part judge approved the Division's plan to retry the matter as to all three children,[2] but did not meet our sixty-day deadline. Rather, the court sought an extension lasting until May 11, 2018, because the previous trial judge was out of state. The trial judge further requested a second extension from this court, which we granted. The case was finally retried six months after the remand

---

[2] The record does not include a new permanency order.

order.  In the remand proceedings, Chip was represented by one law guardian and his sisters by another.

A five-day trial took place via audio video conferencing before the same judge who presided over the first trial, who was no longer sitting in Essex County.  The record is silent as to why the trial was conducted by a judge who both viewed and listened to testimony remotely from chambers in another county.  He heard testimony from the following witnesses: Dr. Monica Weiner, the medical doctor who testified about Chip's injuries in the first trial; Latoya Bowers, the Division caseworker; Dr. Carolina Mendez, the Division's expert; Dr. Andrew Brown, Cindy's expert; Dr. Elizabeth Smith, a forensic psychology and bonding expert who evaluated defendants' bonds with Chip; and Dr. Eric Kirschner, who conducted bonding evaluations as to the girls.

Regarding the injuries from February 2014, Dr. Weiner again testified that Chip had suffered acute posterior rib fractures consistent with squeezing the child's torso or applying force in some other manner, such as shaking, and that Chip's birth three weeks prior could not cause these fractures.  Dr. Weiner further opined that a seizure could not cause the subdural and retinal hemorrhages from which Chip was suffering when admitted to the hospital in November 2014.  Consistent with her prior testimony, she concluded that the

injuries were caused by trauma, but could not rule out accidental trauma, noting that no accidental trauma was reported that would have generated enough force to cause the injuries given Chip's age and limited mobility.

Latoya Bowers, the Division caseworker, testified that following each removal, Anne and Claire, were placed in one resource home and Chip, in another. The Division provided the parents with weekly visitation and arranged bonding and psychological evaluations. It also considered Charles' sister and Cindy's mother as potential relative placements for the children, but Charles' sister did not have space to accommodate the children and Cindy's mother was under investigation in a placement matter related to Cindy's nieces.

Bowers testified that since the second removal, Cindy completed two rounds of therapy and parenting skills instructions. Cindy successfully completed services in 2015, and the Division did not ask her to undergo additional services geared toward reunification. However, the Division worker did not go out to see the apartment Cindy rented in anticipation of reunification, conceding that there was no excuse for not having done so.

Defendants' visits with the children initially took place at a Division-approved program, but following the first trial, visits took place with the resource parents, sometimes lasting up to six hours. The girls' resource parents

notified defendants when the girls had softball games, which defendants attended. Bowers noted that, during visits, Anne and Claire were happy and excited to see their mother. Although the girls were doing well in resource placement, Anne was having trouble at school, and told her teacher she did not have to do school work or listen anymore because she was going home with her mother. On several occasions, Chip's resource parents reported Cindy seemed "cold" during visits, simply handing Chip her cell phone to play games while she sat back. They had fewer concerns with Charles, who was more attentive to Chip.

Defendants separated in 2015 and both agreed that all three children should live with Cindy alone, Bowers stated. However, both sets of resource parents were committed to adopting the children for whom they provided care. Bowers observed no concerns in either resource placement during her monthly visits.

Four experts conducted updated bonding and psychological evaluations, and testified as to their results. The Division's expert, Dr. Carolina Mendez, and Cindy's expert, Dr. Andrew Brown, each evaluated defendants' bonds with Chip and with the girls. Dr. Elizabeth Smith, an expert in forensic psychology and bonding, conducted bonding evaluations that related to Chip only, while Dr. Eric

Kirschner conducted bonding evaluations specific to the girls. All four experts concluded the results of the updated bonding evaluations were positive, as the children established bonds with both their biological parents and with their resource parents.

Kirschner and Brown both recommended reunification of the girls with Cindy. Brown also recommended returning Chip to Cindy's care, whereas Mendez and Smith recommended terminating defendants' parental rights to all of the children based solely on the parents' inability to explain what or who caused Chip's injuries.

All of the experts who conducted updated bonding evaluations of Cindy's relationship with Anne and Claire, who at the time were seven and six years old respectively, concluded the girls were highly attached to their mother in a strong, positive bond. Kirschner and Brown both testified that Cindy was Anne's and Claire's primary attachment figure, and Mendez similarly testified that the girls "had no reservations about their preference" to live with their mother. Brown testified that severing the girls' relationship to Cindy would likely have "psychologically devastating" consequences for both girls and "would induce a significant harm . . . and trauma that could never be mitigated" by the resource parents. Kirschner similarly testified that termination of parental rights could

cause the girls to suffer "serious and enduring harm." Mendez opined the girls had an "equal bond with their mother and their resource mother," but agreed there was "no doubt that if parental rights were terminated, the girls would suffer . . . severe and enduring psychological harm." Nonetheless, Mendez believed the resource parents could mitigate that harm.

In an interview Brown conducted with Anne alone, Anne stated that she wished "all the time" she could be with her mother. She cried for her mother and said she would be "very upset" if she never saw her again. Brown opined Anne had a deep emotional attachment to Cindy and that severing the relationship "would serve no purpose but to induce harm in this child." Claire also told Brown, in a private interview, that she missed her mother, dreamt about her, and would be sad if she never saw her again.[3] Brown opined that terminating Cindy's parental rights could lead Claire to suffer "severe emotional trauma" that could lead to "truncated psychological development." Both Anne and Claire stated they wanted to live with their brother as well. Brown opined that, even with the aid of psychotherapy, the resource parents would be incapable of mitigating any harm to the girls resulting from the severance of their relationship with their mother.

---

[3] None of the children testified.

In regard to Chip, Brown opined that Chip also had a healthy, positive attachment with Cindy and to his big sisters, who appeared to operate as a family unit. Cindy was more capable, in Brown's view, than the resource parents of keeping up with Chip, an active child who was full of energy. The resource parents, who were in their sixties, struggled to keep up with and play with Chip during the bonding evaluation. As with the girls, Brown believed that terminating Cindy's parental rights to Chip would destroy his healthy, positive attachment to her and to his sisters. Brown opined that as Chip grows and develops, he would wonder about his mother and sisters if not reunited with them, and "in the long run," severing those attachments would result in greater harm. Severing Chip's relationship with his resource parents would not cause severe and enduring harm, in Brown's view, because he already developed a positive and healthy attachment to Cindy and to his sisters.

Mendez and Smith both testified that in their opinions, Chip's primary attachment was his resource mother. Smith conceded, however, that Chip was also positively bonded with Cindy and Charles and would miss them if not able to see them anymore. Smith noted Chip called both defendants and the resource parents "mommy" and "daddy."

In Smith's view, compelling factors for a child of Chip's age (four years old) were his age at the time of placement and the length of time in placement. At the time, Chip was in placement nearly his entire life, with the exception of the first two weeks of his life and the six weeks he was briefly reunified with defendants prior to the second removal.

Mendez was similarly concerned with depriving the children of permanency further, as permanency is important to a child's health and development. Accordingly, Mendez concluded that termination of defendants' parental rights was in the best interests of all three children, because "[t]he most important relationships that need to be maintained" were the children's relationships with their respective resource parents.

As to ending the relationship the girls had with their resource parents, Mendez, Kirschner, and Brown all agreed it would have a harmful effect on the girls. Nonetheless, Kirschner and Brown agreed Cindy was capable of mitigating those harmful effects.[4] Brown noted that Cindy was aware the children could not simply be removed immediately from resource placement, but would start with overnight and weekend visitation and expand from there.

---

[4] Mendez did not directly address in her testimony whether she believed defendants were capable of mitigating the harm to the girls from severing their relationship to their resource caretaker.

A-5424-17T4

Kirschner recommended family counseling for Cindy and the girls if reunification occurred. He believed the strength of the maternal relationship could potentially mitigate any anxiety to the girls stemming from the loss of the relationship with the resource parents. He further noted that Cindy was open, if reunification occurred, to allowing the children to maintain a relationship with their respective resource parents.

Kirschner and Mendez both agreed the bond between Charles and the girls was generally positive and appropriate. However, Kirschner concluded it was not realistic or feasible to return the children to Charles' care, both based on his psychological assessment, and because Charles did not portray himself as able to assume care of the children.

None of the expert witnesses expressed any concerns about the results of Cindy's updated psychological evaluations. Mendez testified Cindy "made significant achievements" since the first trial, in that she had stable housing and steady employment. She noted Cindy participated in counseling from which she learned "how to better handle her negative emotions." Cindy also stated to Mendez that if reunified with her children she would require all of Charles' visits to be supervised, which showed Mendez that Cindy recognized there was a concern with Charles.

Similarly, Smith viewed Cindy as "a very intelligent, very sincere person[,]" who "works hard" and was "pursuing more education to . . . better support her children." The sticking point for both Mendez and Smith was their perception of Cindy's response to Chip's injuries. Mendez worried that Cindy "used the language of acceptance and moving on," even though she did not know how the injuries occurred. In Mendez's view, "[a]ny reasonably well-adjusted parent would want to know what happened to their son, would want to figure it out," and "would not . . . stop asking questions until she figured it out." Smith was similarly troubled that neither parent seemed concerned about discovering what happened to Chip.

Kirschner found no evidence of any significant psychological dysfunction or impairment that would affect Cindy's parenting. He believed she came to "a psychologically healthier place" since his prior testimony at the first trial—when she had only recently separated from Charles and had not yet demonstrated she could be self-sufficient. Cindy had since benefited from therapy, according to Kirschner, which allowed her to focus on trying to be present for her children in the best way possible, a psychologically healthier perspective than focusing on things she could not control. Although Cindy was unable to offer an opinion as

15

to how Chip's injuries had occurred, she showed an ability to cope with what happened in a healthier way through therapeutic treatment.

Like Kirschner, Brown concluded Cindy was "capable of providing stability and a safe environment for her children."  Cindy lived on her own in a two-bedroom apartment since February 2018, worked as a mortgage processor, and complied with all recommended services.  Brown was not concerned, as Mendez was, that Cindy psychologically "move[d] on" from inquiring further about her son's injuries, because, according to Brown, that is the goal and mission of psychotherapy.

Brown's impression was that Cindy's only contact with Charles, as of trial, was during visitation.  Brown opined Cindy was committed to her children, wanted to remain in their lives, and demonstrated the stability to be able to raise the children in her home.  Brown also agreed that Cindy knew the children could not simply be removed immediately from resource placement, and supported gradual reunification.

Cindy also testified.  She stated she met Charles when she was seventeen and recounted the history of their relationship, noting from early on, Charles had a drinking habit which often led to verbally aggressive behavior.  Charles never hit Cindy, but he would hit furniture at times, and scream loudly.  Charles began

drinking less during Cindy's first pregnancy, when she was nineteen, and shortly thereafter he gave up drinking altogether, which led Cindy to believe Charles' behavior would improve. Cindy asserted that even after he stopped drinking, however, Charles continued to aggressively argue with Cindy.

Cindy recounted how Charles never participated equally in parenting, but would instead come home from work tired and want to eat and sleep rather than be involved with the children as a father. After Chip was born, Charles became increasingly annoyed with Cindy's preoccupation in caring for both their children as well as Cindy's two young nieces, who lived with them at the time.

Prior to Chip's birth, and up until his removal, Cindy's nieces, about eight and seven years old, were placed in defendants' home on a temporary basis. While in defendants' custody, the older niece, who is schizophrenic, engaged in troubling behaviors such as cutting up family pictures and hiding food in drawers. The niece also once reportedly opened a car door on the Garden State Parkway and attempted to jump out. Both nieces had a tendency to play rough with Anne and Claire.

Cindy further testified that on one occasion, when she was eight months pregnant with Chip, she became frustrated during an argument with the older niece and slapped her, causing the child to fall and injure her chin on the railing

of her bed. Although the niece was not badly hurt, the chin injury left a mark and led to a Division referral. A Division caseworker advised Cindy against using corporal punishment, but did not substantiate abuse. Cindy testified that she felt terrible about the slap and did not apply corporal punishment to any child thereafter.

After Chip's birth, in January 2014, Cindy testified that she made it a habit to be in the room when her nieces wanted to touch the baby, and she never saw them behave roughly around Chip. Following the first removal, Cindy testified that she initially suspected that her nieces might have hurt Chip. She testified in the first and second trials she had doubts and concerns about whether Charles may have caused the injuries. She reported confronting him numerous times, to which Charles would respond by becoming irate and defensive, screaming that "he didn't do it," that he loved Chip, and that he waited his whole life to have a son.

When Chip returned to the family for six weeks in fall of 2014, Cindy's nieces no longer lived there. Before the second removal, Cindy recalled Chip appeared sick, weak, and not able to keep food down. Cindy took him to the emergency room where the child was diagnosed with eye and ear infections and was prescribed antibiotics.

By his second day on antibiotics, on November 18, 2014, Cindy stated that Chip's mobility improved and he could move around more. At one point, Cindy testified she put Chip down in his playpen for a nap and told Charles to watch him while she went upstairs to bathe their daughters. About three or four minutes after going upstairs, Cindy heard Chip "scream very loudly," and that "it was not a normal cry like if he just woke up from a nap." Cindy asserted that as she entered the room, she observed Chip having a seizure as Charles was trying to lift him out of the playpen. This was the first time Cindy saw Chip have a seizure, a condition she recognized because it runs in her family. Cindy stated that she screamed at Charles, asking him what happened, and Charles replied that he did not know. Cindy called an ambulance and went to the hospital with Chip. At the hospital, medical testing revealed Chip's subdural hematomas and retinal hemorrhages that led to the second removal. See C.J.R., 453 N.J. Super. at 459-60.

Cindy testified she was immediately suspicious of Charles after the second injury, both because she never hurt Chip and because she perceived Charles to be "very cold about everything," while Cindy described herself as "freaking out" and panicking. Cindy confronted Charles again about Chip's injuries, and Charles continued to be defensive and irate. Cindy stated he would get angry

and walk away when she brought up the conversation and tell her she "should know better that it wasn't him."

Despite this, Cindy did not tell the Division she was suspicious of Charles, but offered to take a lie detector test to prove her innocence. Cindy did not believe her daughters could have injured Chip, because the injuries sustained were inconsistent with those that would result from being picked up by a five or six-year old.

Cindy noted that her second round of therapy, which took place after the second removal of her children, helped her interpret and cope with her feelings. She also stated it helped her acknowledge that even though she "may never have an answer to what exactly happened" with respect to Chip's injuries, she "still needed to move on in order to have a healthy life" for herself and her children.

Cindy testified she had a great relationship and close bond with all three children, that she never hurt them, and that she would not do so in the future. To discipline them, Cindy asserted she would do brief time-outs or, for the older children, take away their toys. She testified she never used drugs and rarely drinks alcohol.

Cindy testified she would have no difficultly reuniting with the children. Chip would have his own room in Cindy's two-bedroom apartment, the girls

would share the other bedroom, and Cindy would sleep in the living room. As of trial, however, the Division had not conducted a safety assessment of Cindy's home. Cindy further testified that she would work while the children were at school and would enroll the children in after-school activities. She testified she would never again have a relationship with Charles, but if the children were reunified with her, she would allow Charles only weekly supervised visits.

Cindy acknowledged if the children were removed from their resource homes, they would be upset at first. However, she intended for the resource parents to always have a place in the children's lives, as the children "see us like one big happy family." For example, Chip calls his resource parents "mama," and "papa," terms that a child, in Puerto Rican culture, would use for his grandmother and grandfather, respectively, she noted. She stated it was good for the children to have "another person who loves them" and did not see any benefit in taking that away. She would rather the children just have three sets of grandparents.

As part of a gradual reunification process, Cindy anticipated allowing the children sleepovers at the resource parents' homes periodically or on weekends and having the group still celebrate events and holidays together. Cindy was willing to engage in family therapy or other services to help the children with

the transition. Conversely, if her parental rights were terminated, Cindy did not believe she would be able to see her children as often, because at times, her calls to the resource parents went unanswered.

On the last day of trial, immediately after closing arguments, the court rendered an oral decision that all four prongs of the "best interest" test were met. The court entered an order of guardianship as to all three children on July 10, 2018.

On July 27, 2018, defendants filed appeals. The appeals were consolidated. On August 10, 2018, the Law Guardian for Anne and Claire joined the appeal.

Our review of a trial judge's findings and decision to terminate parental rights is limited. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278-79 (2007) (citation omitted). We do not reverse the family court's termination decision "when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (citation omitted).

We defer to the trial court's credibility findings and fact-findings because of its expertise in family matters and its ability to develop a "feel of the case that can never be realized by a review of the cold record." N.J. Div. of Youth

& Family Servs. v. M.C. III, 201 N.J. 328, 342-43 (2010) (citation omitted). This court should not disturb these findings unless they are "so wide of the mark that the judge was clearly mistaken." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citations omitted).

Parents have a constitutionally protected right to raise their biological children, even if the children are placed in the care of a resource family. In re Guardianship of J.C., 129 N.J. 1, 9-10 (1992) (citing Santosky v. Kramer, 455 U.S. 745 (1982)). The State may act to protect the welfare of the children, but this is a limited authority, applying to circumstances where the parent is unfit or the child has been harmed or placed at risk of harm. Id. at 10; N.J.S.A. 30:4C-12; see N.J. Div. of Youth & Family Servs. v. I.S., 214 N.J. 8, 34-35 (2013).

To prevail in a proceeding to terminate parental rights, the Division must establish each element of the "best interests test":

> (1)   The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2)   The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3)    The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4)    Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

These four prongs "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). The State must prove each prong of this test by clear and convincing evidence. N.J. Div. of Youth & Family Svcs. v. R.G., 217 N.J. 527, 559 (2014). Additionally, courts may not use presumptions of parental unfitness and any "doubts must be resolved against termination of parental rights." K.H.O., 161 N.J. at 347.

On appeal, Cindy argues the judge erred in terminating her parental rights because the Division did not establish she was responsible for the harm to her children under prongs one and two of N.J.S.A. 30:4C-15.1(a). She also argues the Division offered no evidence as to Anne and Claire beyond what was presented in the first trial, which resulted in a reversal. Finally, Cindy argues the expert evidence was in equipoise, at best, as to prong four, and therefore the Division did not meet the standard of clear and convincing evidence.

24

Charles argues he, as well as Cindy, were deprived of a fair trial because the judge was not physically present in the courtroom but conducted the entire trial remotely through an audio video feed.[5] Charles also argues the judge misapplied the law and ignored the directive of this court by relying upon the shifted burden of proof. He also raises the arguments raised by Cindy. It is significant that Charles is not asking to be reunified with his children but asks they be returned to their mother.

Anne and Claire argue the Division again failed to show the parents harmed them or would continue to harm them and that they wished to be reunited with their mother.

Having reviewed the trial record in its entirety we are constrained to conclude there is not "substantial credible evidence in the record to support the court's findings." E.P., 196 N.J. at 104. We previously instructed the Family Part that its decision to give preclusive effect to the Title Nine fact-finding in the Title Thirty proceedings, which shifted the burden to defendants and required them to rebut the presumption of abuse and neglect through their own evidence, created an unconstitutional asymmetry we consider to be plain error

---

[5] The record does not identify whether this was done via Skype or some other audio video feed.

on a critical question of law warranting reversal. The record herein demonstrates the essential error was repeated by the trial court.

As to Chip, the court considered prongs one and two together. The court noted that unrefuted testimony established that Chip's two life-threatening injuries "were caused by physical abuse by one of the parents." The court then asked, rhetorically, "what type of monster or person could inflict these types of injuries on a baby and a small child?" The court added this was a question "the parents should have been asking," and that defendants were the only two people in the courtroom who knew what happened to Chip since one parent caused the injuries and the other knew who was responsible. The court said:

> I have no way of knowing sitting here who actually committed this horrific abuse . . . [but] one of the two people sitting in this courtroom is an abuser and capable of doing tremendous harm to a child, and the other one was an enabler and excuser and stuck her head in the sand.

The court found that there was harm under prongs one and two—both "harm from the abuse," and "harm from protecting it."

The court noted that Smith and Mendez testified there existed "a substantial clear and present danger and substantial risk of harm" to the children that defendants had not alleviated. The harm involved both the abuse and the subsequent removal. Notwithstanding the positive bonding reports of the

26

Division's own expert, the court disbelieved the "false picture" of a "happy family" the court believed defendants were presenting and stated that reunification, "which the parents have apparently instilled in their children with these visitations, is a myth."

Cindy's testimony that she had suspicions about Charles seemed, in the court's view, to be "measured, rehearsed," and "designed to present herself in the best light." The court was also concerned that Cindy had continued to live with Charles for ten months after the second removal and further believed Cindy was "sweeping the dirt under the rug" by "moving ahead with this case." The judge offered no assessment of the fact the parties had not lived together for over three years. The judge did not appear to consider the evidence presented by the Division and its experts regarding Cindy's progress as well as her separation from Charles, and did not address her current situation. The court rejected Brown's testimony that the mission of psychotherapy was to "move on," noting: "I can't believe any psychologist should take the stand and say those type of things and believe that the child is now safe because they've gone past it." The court was skeptical that, through therapy, Cindy had achieved "great psychological insight and . . . great benefit," notwithstanding that all of the experts testified she had made progress.

A-5424-17T4

With respect to the girls, the court found that they also suffered harm under prongs one and two from twice being removed from their home and that defendants had still "not dealt with this clear and present danger that exists in this case." The court noted it did not know how Cindy would be able to monitor Charles on visits if she was reunified with the children. Defendants had "not come forward to deal with whatever happened four years ago" and remained "in the same position" as then.

With respect to prong three, the court held that the Division made reasonable efforts and that the court did not know "if there is a service that will change these people or change these parents to have them recognize where they are or where they should be," but that, in any event, the Division provided visitation, assessed relatives, and provided psychological counseling and evaluations.

With respect to prong four, as to Chip, the court found it clear that terminating Chip's relationship to his foster parents would cause more harm than terminating Cindy's and Charles' parental rights. The court opined without support from the record that Chip, an infant when removed, had no memory of living with defendants or his sisters and had bonded well with his resource parents with whom he had lived for most of his life.

As to the girls, the court noted that their resource parents had also developed good relationships with them and met their needs for four years. The girls, despite living apart from their parents that whole time, had thrived. The court noted that the resource parents had shown "every inclination to keep a relationship with the natural parents" voluntarily, without any court order, and questioned why they would stop doing so if defendants' parental rights were terminated. The court noted that "with appropriate counseling," the termination of defendants' parental rights to the girls would "not do more harm than good" and that "returning them to their parents would do extensive harm." Given the opinions presented at trial by all of the experts, we consider these findings about the girls "wide of the mark."

In addition, the trial judge's finding with regard to the first and second prongs, that he could not determine from "sitting here who actually committed this horrific abuse . . . [but] one of the two people sitting in this courtroom is an abuser and capable of doing tremendous harm to a child, and the other one was an enabler and excuser and stuck her head in the sand," was indeterminate.

Under N.J.S.A. 30:4C-15.1(a), the Division must prove by clear and convincing evidence termination is in the best interest of the child. New Jersey Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012) (citing New

Jersey Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 113 (2011)).  Our Supreme Court has determined the clear and convincing evidence standard is satisfied when, in the mind of the factfinder, there is a "firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the precise facts in issue."  New Jersey Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 168 (2010) (quoting In re Seaman, 133 N.J. 67, 74 (1993) (citation, internal quotation and editing marks omitted)). "Because of the elemental nature of the parent-child relationship, and recognizing that the severing of that relationship is among the most 'severe and . . . irreversible' forms of state action," E.P., 196 N.J. at 102 (quoting Santosky, 455 U.S. at 759), courts "consistently impose[] strict standards for the termination of parental rights" and "all doubts must be resolved against termination of parental rights." K.H.O., 161 N.J. at 347 (citations omitted).  The issue under the statute is "the 'best interests of any child,' not simply the presence or absence of culpable fault on the parent's part." In re Guardianship of R., 155 N.J. Super. 186, 195 (App. Div. 1977) (quoting N.J.S.A.30:4C-15(c)).

The clear and convincing standard of proof requires that the result shall not be reached by a mere balancing of doubts or probabilities, but rather by

rigorous evidence which convinces the fact finder that the allegations sought to be proved are true. The issue of how Chip sustained his injuries is critical to all four factors.

We reject the Division's assertion that it established by clear and convincing evidence the children's health and development will continue to be harmed by a parental relationship with Cindy. The record demonstrates Cindy and Charles both present differently from the parents they were when the litigation began and present differently as individuals now. They are no longer together as a couple. Charles is not asking for the children to be reunited with him. Cindy successfully completed services in 2015, and since then, the Division has not asked her to undergo additional services geared toward reunification. The Division worker conceded they did not inspect the apartment Cindy rented for herself and the children. The court treated the parents monolithically by failing to differentiate between the parents individually and by disregarding their current respective circumstances. Likewise, the court also treated the children in a monolithic fashion, despite the differences in their experiences, both as to the abuse and the time spent with their parents pre-removal. The Division offered no new evidence of harm to the two girls as a result of their relationship with their mother or their father.

We reverse the entry of guardianship with instructions to the Family Part[6] to reunite Anne and Claire with their mother within fifteen days. We recognize reunification with Chip is more complicated. We conclude, however, the Division did not meet its burden of proof as to Chip and we also reverse the entry of guardianship as to him. We are mindful of the legitimate concerns raised by the Division and its experts and we do not order the immediate reunification of Chip with his mother. The matter shall continue under the abuse or neglect (FN) docket with reconsideration of the plan for permanency. We note the trial judge did not consider or discuss alternatives to termination such as kinship legal guardianship, and those alternatives should now be explored. See N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246 (App. Div. 2019).

While we recognize the risks attendant to returning a twice-injured child to a parent under the circumstances presented here, we remind the parties the Division is not without the ability to continue to monitor a family in need of services and to reinstitute litigation for as long as is necessary. The Supreme Court of the United States stated in Rivera v. Minnich,

---

[6] We direct this matter be assigned to the Presiding Judge of the Family Part.

"natural parents have no 'double jeopardy' defense" against the State's repeated efforts to terminate parental rights. If the State initially fails to win termination . . . it always can try once again as family circumstances change or as it gathers more or better evidence. "Even when the parents have attained the level of fitness required by the State, they have no similar means by which they can forestall future termination efforts."

[483 U.S. 574, 582 (1987) (quoting Santosky, 455 U.S. at 764).]

The imposition of a higher standard of proof protects the parents, and to some degree the child, from renewed efforts to sever their familial ties.

We add the following comments about the manner in which the case was tried. We need not reach the issue of whether a trial conducted remotely by a judge over video and audio conferencing deprived the parties of a fair trial. Although no evidentiary rule specifically governs the admissibility of either telephonic or remote video testimony, both Aqua Marine Prod., Inc. v. Pathe Computer Control Systems Corp., 229 N.J. Super. 264, 275 (App. Div. 1988) and State v. Santos, 210 N.J. 129, 142 (2012) framed the admissibility of remote testimony as an evidentiary admissibility issue.

We recognize some situations require flexibility. See, eg., N.J.S.A. 2A:4-30.155(f) (stating in child support proceedings, "a tribunal of this State shall permit a party or witness residing outside this State to . . . testify under penalty

of perjury by . . . audiovisual means."); N.J.S.A. 2A:34-63(b) (stating in a child custody proceeding, "[a] court of this State may permit an individual residing in another state to . . . testify by telephone, audiovisual means or other electronic means before a designated court or at another location in that state."); R. 1:20-6(c)(2)(A) (allowing, in attorney disciplinary hearings, the acceptance of testimony by video "[i]f special circumstances dictate"); R. 1:20A-3(b)(4) (allowing, in arbitration proceedings, for the acceptance of testimony by video "[i]f special circumstances dictate"); R. 7:8-7(a) (permitting a municipal court defendant to appear at trial "by means of a video link as approved by the Administrative Office of the Courts").

The record here does not explain why this trial was conducted in this manner, or why, if there was a courtroom available in Essex County where the parties and witnesses were all in attendance, the trial judge considered it acceptable to conduct a trial from a distant county. We do not endorse this practice in trials of such constitutional magnitude as termination of parental rights.

Reversed and remanded with directions consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5424-17T4