SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**In the Matter of R. Douglas Hoffman (D-90-23) (089279)**

**Argued November 4, 2024 -- Decided March 10, 2025**

**RABNER, C.J., writing for a unanimous Court.**

This matter involves serious acts of misconduct by a Judge of the Municipal Court, Respondent R. Douglas Hoffman. In light of Respondent's "nonconsensual, inappropriate, and sexually suggestive touching of [an] employee," the Advisory Committee on Judicial Conduct (ACJC) found that Respondent violated three canons of the Code of Judicial Conduct and recommended that he be removed from office.

Respondent acknowledges that he violated the canons charged in this matter but does not admit to touching the employee "in a sexually suggestive manner." He argues that "the recommended quantum of discipline" -- removal -- "is excessive and inconsistent with long-established precedent."

**HELD:** The Court's review of the record reveals that Respondent invited a subordinate court employee to his summer home, provided beer and shots of hard liquor that the two drank liberally over the course of several hours, discussed intimate details of the employee's sexual relationship with her boyfriend, and then touched her in a sexually suggestive manner without her consent. Because of the blatant and serious nature of Respondent's misconduct, the Court finds beyond a reasonable doubt that there is cause for removal.

1. The Court can remove a judge "for misconduct in office, willful neglect of duty, or other conduct evidencing unfitness for judicial office." N.J.S.A. 2B:2A-2. Removal proceedings are intended to assure the public that the judiciary is worthy of its trust. Various aggravating factors are relevant to the inquiry. They include whether the behavior is unbecoming and inappropriate for one holding the position of a judge; whether the conduct harmed others; and whether the victim was in a vulnerable position. Mitigating factors include whether a matter represents the first complaint against a judge; the length and good quality of the judge's tenure in office; a sincere commitment to overcoming the fault; whether the judge expressed remorse; and an acknowledgment of wrongdoing or expression of contrition from the judge. Removal is warranted when misconduct is flagrant and severe. (pp. 14-16)

1

2. Respondent, who was 75 at the time of the incident, provided alcohol to "A.A.," a vulnerable, subordinate employee, then age 27, and drank liberally with her at his beach house. The two then spoke about intimate details of A.A.'s sexual relationship with her boyfriend. Respondent voiced explicit views about the boyfriend and their intimacy, speculating about the boyfriend's sexual orientation, telling A.A. to "get rid of him," and saying, in sexually explicit terms, that she would find someone else. Respondent then touched A.A. twice without her consent. A.A. perceived the first touch as an attempt to comfort her but testified that Respondent, who had his hand on her knee, then "slid his hand up [her] leg," to her "inner leg and then to [her] crotch." The ACJC properly found that Respondent's "touching of [A.A.] on her knee and inner thigh" was "unwanted and inappropriate" and "may reasonably be construed as sexual in nature." A.A. left the house immediately and reported the incident to her supervisor the same day. A.A. also testified that she suffered lasting harm. She resigned from her position, took steps to avoid seeing Respondent in public out of fear, and continued to have nightmares about the incident one year later. (pp. 3-8, 16-17)

3. Respondent's behavior flagrantly violated the Code of Judicial Conduct. He did not "personally observe[] high standards of conduct," Canon 1, Rule 1.1; did not act in a manner to "promote[] public confidence in the . . . judiciary" and "avoid impropriety and the appearance of impropriety," Canon 2, Rule 2.1; and did not "conduct [his] extrajudicial activities" in a way to avoid "demean[ing his] judicial office," Canon 5, Rule 5.1(A). To the contrary, his misconduct undermined public confidence in him and in the judicial system overall. (pp. 17-18)

4. As to the level of discipline, Respondent points to prior cases that resulted in relatively short suspensions for judges. Those rulings date back a decade and more. Recent cases, by contrast, resulted in more serious outcomes. See In re Russo, 242 N.J. 179 (2020) (removal); In re Falcone, 251 N.J. 476 (2022) (permanent disqualification). Judges now receive mandatory training on the prevention of sexual harassment and know there is no place for sexual misconduct or harassment in the judicial system. Today the Court makes clear that egregious violations of that rule will result in removal from office and not a period of suspension. (pp. 18-19)

5. The Court acknowledges Respondent's lengthy service as a municipal court judge but finds no compelling mitigating factors. Respondent disputes the most serious misconduct in this matter -- sexually touching a subordinate without her consent. He has not expressed remorse or contrition. And his demeanor at the hearing was flippant, defiant, and disrespectful of the disciplinary process. In short, Respondent's conduct was unbecoming and inappropriate for one holding the position of a judge. (pp. 19-20)

**Respondent is removed from office.**

**JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, NORIEGA, and HOFFMAN join in CHIEF JUSTICE RABNER's opinion.**

In the Matter of

R. Douglas Hoffman,

a Judge of the Municipal Court

of the State of New Jersey

On a Complaint for Removal from Judicial Office
Pursuant to Rule 2:14 and N.J.S.A. 2B:2A-1 to -11,
and an Order to Show Cause Why Respondent
Should Not be Removed from Office
or Otherwise Disciplined.

| Argued | Decided |
|---|---|
| November 4, 2024 | March 10, 2025 |

Michelle Mikelberg, Deputy Attorney General, argued
the cause on behalf of the Office of the Attorney General
(Matthew J. Platkin, Attorney General, attorney; Michelle
Mikelberg, on the brief).

Robert Ramsey argued the cause on behalf of respondent
(Law Office of Robert Ramsey, attorneys; Robert
Ramsey, on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

This disciplinary matter involves serious acts of misconduct by a Judge

of the Municipal Court, Respondent R. Douglas Hoffman.

The Advisory Committee on Judicial Conduct (ACJC or Committee) issued a complaint against Respondent that charged him with several violations of the Code of Judicial Conduct. After a hearing, the ACJC found that the charges were supported by clear and convincing evidence. In light of Respondent's "nonconsensual, inappropriate, and sexually suggestive touching of [an] employee," the Committee recommended that Respondent be removed from office.

Our review of the record reveals that Respondent invited a subordinate court employee to his summer home, provided beer and shots of hard liquor that the two drank liberally over the course of several hours, discussed intimate details of the employee's sexual relationship with her boyfriend, and then touched her in a sexually suggestive manner without her consent. Because of the blatant and serious nature of Respondent's misconduct, we find beyond a reasonable doubt that there is cause for removal. We therefore order his removal from office.

I.

To recount the facts, we rely on the record of the hearing before the ACJC as well as recorded interviews that ACJC investigators conducted.

2

A.

Respondent was admitted to practice law in 1972. Since 2010, he has served as a part-time Judge of the Municipal Court in Robbinsville. Since 2022, he has also served as a part-time judge in two shared municipal courts: New Hanover and Wrightstown; and Mansfield, Springfield, and Southampton.

Starting in April 2021, A.A. worked as a clerk in the Robbinsville Municipal Court.[1] She was 27 years old at the time of the incident described below. Respondent, age 75 at that time, was her superior.

On October 15, 2022, A.A. visited Respondent's summer home on Long Beach Island. Respondent had extended an open invitation to his staff to visit the beach house when they were in the area. He invited A.A. more than once, and she was the only court employee to accept the invitation. She texted his cell phone on October 15 and asked whether she could stop by that day; he texted back, "[a]bsolutely . . . anytime."

A.A. arrived at the beach house alone at about 11:30 a.m. and stayed for about four hours. Respondent's son worked at the house that day but was not in the living room when the critical events took place.

When A.A. arrived, Respondent was on the front porch. The two talked there for about one hour. Respondent then gave A.A. a tour of the house, after

_____

[1] We use fictional initials to protect the employee's privacy.

3

which they spent about three hours mostly in the living room.  During that time, Respondent provided alcohol that the two drank in the kitchen.  Respondent had one can of beer and four shots of whiskey; A.A. drank at least two beers and four shots of whiskey.

Initially, Respondent and A.A. sat on separate couches in the living room.  At one point, he took a photo of her on the couch with a beer.  A.A. eventually sat next to Respondent on the same couch where they could both watch a baseball game on her cell phone.  While on the couch, the ACJC found, Respondent touched A.A. "on her knee and inner thigh in a manner that may reasonably be construed as sexual in nature."

Respondent presented his version of what took place in a recorded interview and at a hearing.  Respondent does not dispute the above description of events except for one thing:  he denies that he "touched [A.A.] in a sexually suggestive manner."

An ACJC investigator and assistant counsel first interviewed Respondent in the presence of his attorney in January 2023.  During the interview, Respondent described a conversation he had with A.A. leading up to the critical interaction.  We summarize his comments without recounting the specific details.

4

Respondent stated that A.A. provided intimate details about her sexual relations with her boyfriend and asked Respondent what he thought.  He responded by speculating about the boyfriend's sexual orientation.  He then "tapped her on the knee twice" with his right hand.  When A.A. added that "she was upset" about the situation with her boyfriend, Respondent told her to "get rid of him."  He then "tapped her one more time" while saying, in sexually explicit terms, that she would find someone else.

At the formal hearing before the ACJC in October 2023, Respondent testified:

> A:  I gave her a pat after she told me, for want of a better word, her story with her boyfriend.  I gave her a pat on the knee, and then I gave her a pat on her leg.  That was it.
>
> Q:  Okay.  And what part of your body did you pat her with?
>
> A:  Right hand, two pats on her knee after she told me [about] her problems with her boyfriend sexually.  And then another two pats, probably on her leg, certainly wasn't her knee, and that was it.
>
> . . . .
>
> Q:  And the second pat, what part of her body did you touch?
>
> A:  Same thing, my right hand to her leg.  It wasn't her knee, it was her leg.
>
> Q:  The thigh?

A:  Yes.

Q:  What part of her thigh?

A:  I don't know.  I wasn't watching.  I'm patting, not watching, but I've got a big hand.

Respondent testified the second touching was "probably within a minute of the first."  He conceded he did not ask permission before touching A.A. either time.  As he explained, "[t]hese [were] reassuring taps."  "Why do I need permission for that?"  He also denied touching A.A. in a sexual manner: "[I]t wasn't what I'm accused of allegedly touching" -- "near her crotch."  When asked whether "[p]art of your hand was on the inside of her thigh," Respondent stated, "Correct, probably mid-thigh, closer to the knee."  According to Respondent, A.A. "disappeared" "maybe three or four minutes later."

Much of A.A.'s recorded interview and testimony before the Committee confirmed Respondent's testimony.  Her testimony, however, diverged on certain critical points.

A.A. admitted that, by the time of the crucial incident, she was "highly intoxicated" and would not have spoken about "intimate details" if not for all the alcohol.  She testified that the first touch "was very nice" -- in the nature of an attempt to comfort her.  Next, according to A.A., "[h]e like had [his hand]

6

on my knee, and then he like slid his hand up my leg, and then like went to my -- up my leg . . . and then in my inner leg and then to my crotch." A.A. perceived the second touch as sexual in nature.

A.A. told the investigators that, "in [a] matter of five seconds," she left the house. She later testified that she went to the beach and called her mother to drive her home. She returned to the house roughly an hour later and told Respondent she was leaving.

Respondent texted A.A. about ninety minutes later and asked, "U ok[?]" She did not respond.

B.

Later the same day, A.A. contacted her supervisor, the deputy court administrator, and recounted what had taken place. Among other things, she described the two touching incidents. On Monday morning, two days later, A.A. met with the Robbinsville municipal court administrator and the Township's business administrator and reported what happened. A.A. prepared a written statement, consistent with the testimony summarized above, which was later submitted to the ACJC.

At the ACJC hearing one year after the incident, A.A. testified that Respondent's conduct "still affects" her. She explained that she exhausted her leave time to avoid seeing Respondent at work, and ultimately quit her job

7

because she "didn't want to be around him." She added that she "was afraid to go out in public" for fear of meeting him in their small town and continued to have nightmares about the incident.

After conducting a preliminary investigation, the ACJC filed a formal complaint. It alleged that Respondent's behavior -- "providing alcohol to and drinking alcohol with [A.A.], a subordinate employee, over several hours, while that employee was a guest in his home, and . . . touching [A.A.] without her consent" -- violated the Code of Judicial Conduct. Specifically, the Complaint charged Respondent with violating three rules:

*Canon 1, Rule 1.1 ("A judge . . . shall personally observe[] high standards of conduct so that the integrity, impartiality and independence of the judiciary is preserved.");

*Canon 2, Rule 2.1 ("A judge shall act at all times in a manner that promotes public confidence in the independence, integrity and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."); and

*Canon 5, Rule 5.1(A) ("Judges shall conduct their extrajudicial activities in a manner that would not . . . demean the judicial office . . . .").

8

C.

The ACJC held a two-day hearing in October and November 2023. Respondent, A.A., and two court administrators testified. Part of that testimony is summarized above. In a post-hearing letter brief, Respondent maintained that he did not "inappropriately touch" A.A., but he acknowledged that his conduct otherwise "constituted sufficient evidence to support" violations of the Code of Judicial Conduct. Counsel for the ACJC argued for Respondent's removal from office.

The ACJC issued a Presentment in March 2024. It concluded that "Respondent's consumption of substantial amounts of alcohol with a subordinate employee, for which Respondent has reluctantly accepted responsibility, and his nonconsensual, inappropriate, and sexually suggestive touching of that employee for which Respondent has disclaimed any impropriety, constitute blatant and serious violations of the Code of Judicial Conduct." The ACJC recommended that Respondent be removed from judicial office for violating the three ethical canons.

The Committee made multiple findings in support of its recommendation. It noted that Respondent "reluctantly admitt[ed] his impropriety in providing alcohol to and consuming alcohol with" A.A. but "repeatedly attempted to minimize this behavior, claiming, inexplicably, that

9

he 'assumed' [A.A.] 'learned how to drink in college,' and believing that his son's . . . presence in the area provided him with 'protection.'" When pressed about whether it "was ethically improper" to drink "substantial amounts of alcohol" with A.A., "Respondent ultimately acknowledged the appearance of impropriety" but stated "that he believed his son's presence at the house was his 'safety.'"

Beyond "[d]rinking liberally with" A.A., the ACJC found that Respondent's second ethical breach was "his unwanted and inappropriate touching of [A.A.] on her knee and inner thigh in a manner that may reasonably be construed as sexual in nature." The Committee focused "not only on [A.A.'s] stated perception at the time," but also on her response -- leaving the house at once and reporting the incident to her immediate supervisor within hours. "Viewed in their totality," the ACJC concluded, "these circumstances evince[d], clearly and convincingly, that Respondent's touch was unwelcomed and understood by [A.A.] to be of a very personal and sexually suggestive nature to which she took offense."

The Committee rejected Respondent's attempt to discredit A.A.'s testimony because of "her level of intoxication" and "purportedly varying accounts" of how much alcohol she drank. The ACJC reasoned that A.A.'s "self-awareness of the number of drinks" she consumed that afternoon "bears

no reasonable relationship to her recall of a traumatic event involving her superior's unwanted, offensive, and sexually suggestive touch."

The ACJC also observed that "Respondent's demeanor when testifying before the Committee . . . was flippant and betrayed a palpable disrespect for the judicial disciplinary process." The Committee similarly commented that "his generally glib demeanor when testifying . . . reveal[ed] a lack of self-control, probity, and sound judgment unbefitting a judge."

The ACJC weighed various aggravating and mitigating factors before it recommended that Respondent be removed from office. In addition to the aggravating factors recounted above, the Committee relied on A.A.'s "vulnerability as a subordinate employee" and the inherent inequity in their relationship.

The ACJC noted that "Respondent did not offer any evidence in mitigation." It acknowledged his twenty years as a municipal court judge but did not find that his service mitigated his misconduct.

D.

In June 2024, we denied Respondent's motion to modify the ACJC's recommendation of removal. To institute formal removal proceedings, the Court issued an order to show cause and a complaint for removal. The order

directed that a three-judge panel be designated to conduct a hearing and report its findings. See N.J.S.A. 2B:2A-7.

A series of letters followed in which Respondent, represented by counsel, waived his right to the hearing and made the following representations in advance of argument before the Court: (1) Respondent "acknowledges, and for the purpose of this proceeding will not challenge the findings of fact and misconduct contained in the ACJC's Presentment"; (2) "he acknowledges the ACJC's recommendation for removal"; (3) he "will not object to the Court's ability to find, beyond a reasonable doubt, on the existing record that there is cause for removal in conformity with N.J.S.A. 2B:2A-9"; and (4) he "will not challenge the standard of proof or object to the Court's ability to find beyond a reasonable doubt that there is cause for removal on the established record."

The Clerk of the Supreme Court, in turn, acknowledged that "the Court understands Respondent's position that removal is not the appropriate quantum of discipline, and he will present argument to the Court why he should not be removed from judicial office."

12

II.

Respondent acknowledges, as he did before the ACJC, that he violated the canons of the Code of Judicial Conduct charged in this matter. To be clear, though, he does not admit to touching A.A. "in a sexually suggestive manner."

Respondent argues that "the recommended quantum of discipline" -- removal -- "is excessive and inconsistent with long-established precedent." He cites several reported cases that involved sexual harassment and offensive touching, which resulted in suspensions, including In re Seaman, 133 N.J. 67, 72-73, 101 (1993); In re Subryan, 187 N.J. 139, 143, 156 (2006); and In re Jones, 211 N.J. 116 (2012). He contends that his behavior "is significantly less egregious" than what occurred in those matters.

Respondent also distinguishes cases that resulted in removal, In re Russo, 242 N.J. 179, 184-85 (2020), and permanent disqualification, In re Falcone, 251 N.J. 476 (2022). Respondent emphasizes that, unlike his case, those matters involved misconduct on the bench and criminal conduct, respectively.

Respondent maintains that he should be disciplined consistent with prior precedents, despite their age, rather than "ill-defined notions of evolving community standards."

13

Pursuant to N.J.S.A. 2B:2A-4, the Attorney General prosecutes removal proceedings. The Attorney General maintains that the record before the ACJC "established beyond a reasonable doubt that Respondent violated the Code of Judicial Conduct and should be removed from office."

According to the Attorney General, the conduct Respondent admits to -- socializing with A.A. at his home, where he provided shots of alcohol, and "drinking and touching her . . . without permission" -- reflects poor judgment and erodes public confidence in the Judiciary. The Attorney General also underscores that Respondent continues to deny he committed an act of sexual misconduct, an act that harmed A.A.

The Attorney General points to policies that prohibit sexual harassment as support for imposing "the most serious sanction available." More "lenient precedent" from years ago, the Attorney General contends, has not sufficiently deterred misconduct.

## III.

The Supreme Court conducts an independent review of the record in judicial disciplinary cases. In re Brady, 243 N.J. 395, 411 (2020) (calling for de novo review).

The Court can remove a judge "for misconduct in office, willful neglect of duty, or other conduct evidencing unfitness for judicial office." N.J.S.A.

14

2B:2A-2.  Grounds for removal must be established beyond a reasonable doubt.  N.J.S.A. 2B:2A-9; In re Samay, 166 N.J. 25, 31 (2001).  In judicial disciplinary matters, as in other areas of law, a survivor's credible testimony can satisfy that burden on its own.  Seaman, 133 N.J. at 82.  As the Court recognized long ago, "the most serious forms of sexual harassment are also the least likely to occur in public and, therefore, the least likely to be witnessed by third parties."  Id. at 83.

The primary goal of judicial discipline is not to punish a judge.  In re Yaccarino, 101 N.J. 342, 386-87, 394 (1985).  It "is to preserve 'public confidence in the integrity and the independence of the judiciary.'"  Russo, 242 N.J. at 196-97 (quoting Seaman, 133 N.J. at 96).  And the obligation to promote public confidence "extends to judges' private lives" as well as their official duties.  In re Reddin, 221 N.J. 221, 228 (2015) (citing Code of Judicial Conduct, Canon 2 cmt.).

Removal proceedings are intended to "assure the public that the judiciary is worthy of its trust."  In re Coruzzi, 95 N.J. 557, 577 (1984).  Various aggravating factors are relevant to the inquiry.  They include "the extent to which the misconduct . . . demonstrates a lack of integrity and probity"; whether the behavior "is unbecoming and inappropriate for one

15

holding the position of a judge"; whether the conduct harmed others; and whether the victim was in a vulnerable position. Seaman, 133 N.J. at 98-100.

Mitigating factors include "whether 'a matter represents the first complaint against a judge'"; "the length and good quality of the judge's tenure in office"; "a 'sincere commitment to overcoming the fault'"; "whether the judge expressed 'remorse and [made] attempts at apology'"; "whether the judge 'will engage in similar misconduct in the future'"; and "an acknowledgment of 'wrongdoing or [expression of] contrition' from the judge." In re Mullen, 253 N.J. 49, 73-74 (2023) (quoting Seaman, 133 N.J. at 100-01).

Although removal is rare, it is warranted when misconduct is "flagrant and severe." Id. at 72 (quoting In re Williams, 169 N.J. 264, 276 (2001)).

## IV.

We have reviewed the extensive record before the ACJC and agree with its findings. The record reveals serious acts of misconduct by a sitting municipal court judge.

We emphasize the following disturbing facts, among others. Respondent provided alcohol to a vulnerable, subordinate employee and drank liberally with her at his beach house. She drank to the point of intoxication.

16

The two then spoke about intimate details of A.A.'s sexual relationship with her boyfriend. In response to A.A.'s comments, Respondent voiced explicit views about the boyfriend and their intimacy.

Respondent then touched A.A. twice without her consent. She perceived the first touch as an attempt to comfort her. Next, she testified that Respondent, who had his hand on her knee, "slid his hand up [her] leg," to her "inner leg and then to [her] crotch." The ACJC properly found that Respondent's "touching of [A.A.] on her knee and inner thigh" was "unwanted and inappropriate" and "may reasonably be construed as sexual in nature." A.A. left the house immediately afterward and reported the incident to her supervisor the same day.

A.A. also testified that she suffered lasting harm. She resigned from her position to avoid being around Respondent, took steps to avoid seeing him in public out of fear, and continued to have nightmares about the incident one year later.

Respondent's behavior flagrantly violated the Code of Judicial Conduct. He did not "personally observe[] high standards of conduct," Canon 1, Rule 1.1; did not act in a manner to "promote[] public confidence in the . . . judiciary" and "avoid impropriety and the appearance of impropriety," Canon 2, Rule 2.1; and did not "conduct [his] extrajudicial activities" in a way to

17

avoid "demean[ing his] judicial office," Canon 5, Rule 5.1(A). To the contrary, his misconduct undermined public confidence in him and in the judicial system overall.

As to the level of discipline, Respondent argues that removal is not appropriate. He points to prior cases that resulted in relatively short periods of suspension for judges. See, e.g., Seaman, 133 N.J. at 77, 86, 95, 101 (sixty-day suspension for "unremitting course of sexual harassment" of a law clerk over a prolonged period of time that included "grab[bing] complainant's hand and attempt[ing] to place it on his crotch," commenting about having sexual relations with the law clerk on his desk, and reaching under her skirt and touching her knee); Subryan, 187 N.J. at 148-51, 156 (two-month suspension for forcibly kissing a law clerk without her consent); Jones, 211 N.J. 116 (adopting the ACJC's findings and recommendation of a four-month suspension for "unwanted advances" and "deeply offensive" and "inappropriate physical contact" with multiple probation officers and a restaurant employee -- including touching one officer's breast and another officer's buttocks, and attempting to kiss multiple women -- as well as making sexually suggestive remarks while intoxicated at a holiday party).

Those rulings date back a decade and more. Recent cases, by contrast, resulted in more serious outcomes. See, e.g., Russo, 242 N.J. at 184-85

18

(removal from office for mistreating an alleged victim of sexual assault by inappropriately questioning her, among other reasons); Falcone, 251 N.J. 476 (adopting the ACJC's findings and recommendation that a former, part-time judge be censured and permanently disqualified from future judicial service for touching a business acquaintance and employee of a client in an offensive sexual manner and for his dishonesty when testifying before the Committee).

Today, judges of the Superior Court receive mandatory training on the prevention of sexual harassment when they are appointed to the bench and refresher courses thereafter. They are also required to certify annually that they have reviewed and understand the Judiciary's anti-discrimination and anti-harassment policies. Municipal court judges receive similar training; they are subject to policies and training at the municipal level.

All judges know there is no place for sexual misconduct or harassment in the judicial system. Today we make clear that egregious violations of that rule will result in removal from office and not a period of suspension.

Like the ACJC, we find no compelling mitigating factors. We acknowledge Respondent's lengthy service as a municipal court judge. We also note that counsel for the ACJC did not challenge Respondent's statement that he has no prior disciplinary history. But Respondent disputes the most serious misconduct in this matter -- sexually touching a subordinate without

19

her consent. He has not expressed remorse or contrition. And his demeanor at the hearing, as the ACJC noted, was flippant, defiant, and disrespectful of the disciplinary process.

In short, Respondent's conduct was "unbecoming and inappropriate for one holding the position of a judge." See Seaman, 133 N.J. at 99.

## V.

For the reasons set forth above, we find beyond a reasonable doubt that there is cause for removal in this matter. Because of Respondent's serious and flagrant acts of misconduct, we direct that he be removed from office.


JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, NORIEGA, and HOFFMAN join in CHIEF JUSTICE RABNER's opinion.

20

**FILED**

MAR 10 2025

*Heather J Baker*
CLERK

**SUPREME COURT OF NEW JERSEY**
D-90 September Term 2023
089279

In the Matter of                    :

R. Douglas Hoffman              :            O R D E R

A Judge of the Municipal Court  :

 

**R. Douglas Hoffman**, a Judge of the Municipal Court of Robbinsville Township, having been ordered to show cause why he should not be removed from judicial office, and, the Court having found beyond a reasonable doubt that there is cause for respondent's removal for the reasons set forth in the Court's opinion filed concurrently with this order, and for good cause appearing;

It is ORDERED that **R. Douglas Hoffman** is removed from judicial office, effective immediately, and is permanently barred from holding judicial office in this State.

WITNESS, the Honorable Stuart Rabner, Chief Justice, at Trenton, this 10th day of March, 2025.

*Heather J Baker*

**CLERK OF THE SUPREME COURT**